Entering Seward Street The issue in this case was the trial court corrected holding that the Endangered Species Act was not the Forest Service's breach with the legal cause of Skye's damages. It was not. Based both on the statute and the previous rulings of this court, as this court is aware, when a new species is properly listed as threatened pursuant to the ESA, and there is some question as to whether the marbled murrelet is properly listed, that act imposes certain responsibilities and limitations on the government's continuing to authorize activities that cannot be conducted without such authorization. A prime example, of course, is harvesting the timber on these timber sheds. So you agree, then, that if the government hadn't improperly suspended this contract, it would have been compelled by the Endangered Species Act to cancel? It would have been compelled by the Endangered Species Act to do something, Your Honor, that could have been a modification or a cancellation. What kind of modification? You could have modified the contract to provide timber from outside of the sale area, for example. The court in Scott Ford... But it would have been obligated not to permit the harvesting of timber in this area. Yes. Yes. The listing of the murrelet and the obligations flowing from that... If that's true, if they were obligated to cancel or modify, they had the right under the contract to cancel or modify. They did. And they would have been compelled to do that, and you wouldn't have been able to harvest the timber. So have a look at expectancy damages. We would have been compensated for it, of course, Your Honor. Well, you would have been compensated under the cancellation clause for your expenses, right? That's right. Haven't you recovered those? I'm sorry? Haven't you recovered your expenses? Absolutely not. Oh, I'm sorry, Your Honor. We have recovered some out-of-pocket costs, yes. I didn't realize there was any issue on appeal about the out-of-pocket costs. No, we have been paid that. Yeah. So you've been paid everything you would have received if the contract had been canceled. If the contract had been canceled, but the contract was not canceled. Well, I understand. But the answer is that you did receive all the compensation. That assumes the validity... under the cancellation clause of the contract. That assumes the validity of that clause, which we would not agree with, Your Honor. The validity of the clause? The cancellation clause. What's invalid on that? Because we believe that it violates the regulations. That the Forest Service is not allowed to limit their liability for cancellation by virtue of regulation. Is that issue briefed on appeal? No, Your Honor. That was not an issue in the case. Because cancellation did not occur. This was a suspension case. The listing of the merlin and the obligations flowing from it, as this court said, were events that induced the Forest Service to choose to suspend the contractor's performance. The only act of government that caused Scott to experience a delay was the Forest Service's order to suspend. This court said that at 1367 of Scott IV. It further said that the listing of the merlin was not an intervening act that itself directly prevented Scott from performing. These findings notwithstanding, the trial court nevertheless concluded that the ESA was the legal cause of Scott's damages. This erroneous conclusion appears to have been based on the trial court's inability to sort out the way in which the ESA applies. First, to activities that still require government authorization. Such as the issuance of a permit, or here, the authorization to enter the sale area and cut the timber. Talk to me about Section 7A of the Endangered Species Act. It says very clearly there that an agency is not to allow any endangerment of a habitat. It's not to continue to authorize the performance of activities. Assuring that any action authorized, funded, carried out, is not going to jeopardize the habitat. That's correct, Your Honor. Any action. Now, this contract would conceivably jeopardize the habitat. They may cut down their houses. Yes, Your Honor. So, how do we get around the language of this clause, which says the agency could not have proceeded with the contract? This court already dealt with that. It said, yes, that's what the statute said, and therefore they decided to take an action of suspending the contracts. And that was a breach of contract. This court's already said that. But the court said that they could have canceled it, right? The court said that suspending the contracts was a breach of contract. Yes, they could have canceled it. They could have canceled it. They could have modified the contract. The point was that if they had proceeded properly by canceling instead of suspending, they would have been liable for the out-of-pocket expenses. I'm not sure that proceeding properly would have been the term. Your Honor said that properly. I think they were very concerned at the time that by canceling the contract, they had huge exposure on these 111 contracts, and therefore chose not to cancel. But the exposure under the contract was for the out-of-pocket expenses. They believed, as I believe, as I do, that that contract was not limited to liability, the government's liability, only to out-of-pocket costs. They certainly believed that has to happen. Cancellation? Yes. What else could there be? A breach of? Lost profits. How can you read the contract as allowing lost profits in the event of a cancellation? Because, Your Honor, that clause violates the regulations under which the foragers proceed. That is, the regulations state that in the event of a— On its face, or its expectancy damages, but you're saying— Yes, Your Honor. To the extent that it does that, it's invalid. Yes, Your Honor, that's correct. And that was a key thought in the foragers' process, because you see that the foragers never took any action to cancel these contracts, nor these 14, nor the other 100 contracts that are covered by this action. Not in this case, but they similarly were suspended. Mr. Saltzman, are you saying then that because it was suspended instead of canceled, under the cancellation provision that they had a right to cancel, only out-of-pocket expenses would have been paid? As written, they would have only been paid out-of-pocket expenses, out-of-pocket expenses. We do not believe that that clause validly limits the right to just out-of-pocket. That is not an issue in this case, because there never was a cancellation. That's why it was not briefed. If Your Honors feel that that's important, I would ask to leave to file some additional memorandums to indicate, to clarify that for you. However superficially plausible the trial court's view may have been, its holding is nevertheless erroneous, because the ESA could only halt actions for which Scott was authorized. When the suspension occurred, Scott was no longer authorized to get on the land. Therefore, it could not cut down any trees, it could not commit any timber under 7D. But even if he were authorized, they had to halt these actions. They could not authorize, Your Honor. That's correct. And they cannot do anything that jeopardizes the continued existence. And once they... So isn't the trial court correct that it's the Endangered Species Act that is your problem, not the contract? No. Your Honor, they had multiple things that they could do. As we talked about, modification, cancellation.  As this Court found, suspension was a breach. That suspension took away our right to be on the land. We could do no violations of the Endangered Species Act because being on that land would make us a trespasser. But the problem is that if they proceeded the way they should have and canceled, we would have been entitled to out-of-pocket expenses. And you agree that you've gotten the out-of-pocket expenses? I don't mean to argue with Your Honor. But if they had canceled, which they didn't do, we still would have sued for our lost profits because we say that the clause 9.51 would have been invalid. And as I said, if Your Honor is hung up on that point, I would ask Lee to file a memorandum to explain our position. As I said, we couldn't have gone on the land. Once they suspended us, we would have been in breach. I'm sorry, we would have been criminally trespassing. And removing any timber, of course, would have been a violation of Prohibition set forth in 36 CFR 261.6, the unauthorized removal of federal property. Mr. Solomon, as an aside, the CFC entered a Rule 54B judgment on Count 16. I noticed there were Counts 12, 13, and 14 filed somewhere, somehow, and they seem to have vanished in the Netherlands. What happened to those counts? If I recall, 12, 13, and 14, those were the subject of our motion for summary judgment. Two of them involved non-C601 contracts, and the court granted our motion with regard to those. With regard to the third count, I think it would be the Count 15, if I'm not mistaken, that was a C601 contract, and the court treated that in the way that it treated all the other C601 contracts. Basically, assuming even that there was a breach, that he found that there was no causation of damages. Were those counts still pending? No. No, they've all been resolved. They've been incorporated into the appeal before Your Honor. I want to talk briefly about the government's primary argument that, in this case, that it may avoid liability for the breach by retroactively terminating, Your Honor. Such a rule does not, however, exist even with regard to standard procurement terminations of convenience clauses, let alone with regard to conditional clauses such as the one present here. As this court has held with regard to standard terminations of convenience clauses, constructive termination is applied when the basis upon which the contract was actually terminated is legally inadequate to justify the action. That was the maximum case. The government here does not seek a constructive termination. Just one other question. Scott Timber proceeded as an applicant. Doesn't that mean that you agreed not to log 2? No, it doesn't, Your Honor. What it does do is... An applicant under that same section, Section D in this case, has to make no irreversible or irretrievable commitment of resources. They have to avoid the damage. So, didn't you agree? No. I think what the applicant's situation indicates is, first of all, that we needed the Forest Service's permission to continue performance. An applicant is someone who needs that approval. Therefore, again, it shows that we could not have gone out onto the land and done anything, including cutting the trees. Moreover, that timber that is in question did not belong to Scott Timber. It could not commit that resource. At all times, title to that was in the Forest Service. And we could only cut that with their permission. They withdrew that permission when the suspension occurred. Therefore, we could not have committed that resource in violation of Section 17. I see that I'm getting into my rebuttal time. I thank you, Your Honor. Thank you, Mr. Sullivan. Mr. Crowe. May it please the Court. This Court should affirm the judgment of the United States Court of Federal Claims, which, having entered judgment for Scott for others of its expenses, held that Scott was not entitled to cover what we characterize as breached expectancy damages, that is, the expected profit that it would have earned. Now, Scott today has characterized the issue as whether the Forest Service and not the Endangered Species Act was the cause of Scott's damages. And indeed, the trial court characterized the issue in the same manner. We don't believe that to be the proper question for the Court to decide. Is Mr. Saltman correct that you had alternative ways of dealing with this once the problem arose in the Endangered Species Act? That's absolutely incorrect, Your Honor, and I was planning on addressing that. Most of the units were eventually determined to be occupied, and the alternative available to the government in this case, without sufficient knowledge of the status of the individual sale units, was either to temporarily delay harvesting. One of the options that Scott has argued below was the government should have engaged Scott in negotiations and asked for a voluntary suspension of operations. Absent that, the only alternative available to the government was to cancel these sales. And indeed, Scott, in his brief to this Court, and at its reply brief dated January 8, 2003, at page 9, specifically acknowledged the fact that the government had the contractual authority to terminate. Scott made exactly the same argument below to the Court of Federal Claims, which was adopted in the Court of Federal Claims decision, and that is brief of Appellant Scott, Timber Company, September 30, 2002, at page 11. The reply brief excerpt that I've referenced is at page 9. And this Court, in its decision at 333 Fed 3rd at page 1367, specifically held that the Forest Service had contractual authority to suspend. We're not just dealing with an authority question. It was obligated by the Endangered Species Act either to take some action that would have stopped the logging. There's an improper action of suspending it, but if it didn't suspend, it was obligated to cancel, right? That's absolutely correct. Given this Court's reading of the fact that the Forest Service had no authority to temporarily suspend, the only option that was present to the Forest Service in this case was to cancel. And as we pointed out in our brief, one of the options considered during the environmental deliberations in which Scott was an applicant was, in fact, the option, if you will, of canceling the scales. And Scott, in its capacity as an applicant, specifically argued against that option. So here the government had the right to take this certain action, which Scott concedes would have eliminated any breach damages. Scott argued against that. And Scott's position now, that the government lacked that contractual authority, is directly inconsistent with the position Scott took before the Board of Federal Claims, before this Court in its reply brief, in the first appeal of this matter at page 9, where Scott said, and let me quote this, C6205 provided the Forest Service with authority to cancel or modify the contracts that complied with EAST. As I understand the comments now, that's in direct contradiction to an argument that was presented in this Court in the first appeal of this instance. And indeed, this Court expressly adopted that reading of C6205 at page 367 of its initial decision. Scott has identified the issue in this appeal, and I think this characterization is important, as whether the Forest Service, not the Endangered Species Act, caused Scott's damages. That was not the argument the government presented in its motion to summary judgment below. The government, in its motion to summary judgment below, argued that Scott could not meet its burden to prove breach expectancy damages. And that question has been addressed numerous times by various panels of this Court. But ultimately, I think, the broad outline has to be consistent with the Supreme Court's resolution of this question, as that resolution is set forth in the decisions of both College Point Vote and Penn Founding. In College Point Vote, the Supreme Court considered the situation that existed when the President had the authority to cancel a contract. And the Court articulated the rule that where the government has the right to cancel a contract, the party is not entitled to breach expectancy damages. This in no way is inconsistent with general notions of contract expectations, because the party is, of course, constructively aware of the statutes and the regulations. And where the government has the right to cancel a contract, a party has no reasonable expectation that it would be entitled to breach expectancy damages if circumstances arise such that the government is required to cancel the contract. But if a mutilary is suspended, does that mean that they would be looking to alternative resolutions of the problem, rather than termination? That's exactly what happened to me, Your Honor. And Congress stepped in. We disagree completely with Scott's characterization that the government had the statutory and regulatory authority to provide substituted timber. That issue wasn't addressed below. And we think that under the terms of the various Forest Service statutes and regulations, in order to put a new section for sale, special authority would be required. What happened in this case, given the magnitude of the suspension of the logging, Congress stepped in and provided just such authority, and that is the Recisions Act. So the Forest Service in this case received specific statutory authority to provide replacement timber, different timber, unadvertised timber. But under the Recisions Act, the Forest Service had the authority to provide that timber as a replacement to avoid the problem that occurred in this case, when because of the provisions of the Endangered Species Act, the Forest Service was not committed to allow Scott to go ahead with logging. Was that authority issued after the suspension in most of these contracts? Yes, it was, Your Honor. And it was in specific response to the suspension. They called this a crisis in the Northwest, given the magnitude of the suspension of the logging. Congress, appreciating both the significance, the economic significance to the lumber companies and the communities who would be deprived income, stepped in and gave the Forest Service authority that authority that they previously lacked, and that authority was to provide substitute replacement timber for the contracts in this case. I'm sorry? I don't understand. If the Forest Service could supply replacement timber, why was it obligated to do that? Well, because they had no authority to do that until the Recisions Act was passed. When was that? That was passed well after the suspensions in this case, I believe 1995. So after the suspensions were in place... When was the original contract? The contracts in this case have actually been kept open. Most of the contracts in this case are still open, and that is because Scott is receiving replacement timber under the provisions of the Recisions Act. So the contracts as vehicles to allow that to occur, the majority of the contracts are still open. Some of them have been deployed. Is there any contention by Scott that they should get more replacement timber than they're getting? There have been disputes with regards to the replacement timber that's been made available. There was a settlement agreement with regards to the actions brought under the Recisions Act, which provided that Scott's entitlement to any relief in this action is separate and apart from the Recisions Act. So did they have a claim under the Recisions Act that they didn't get what they were entitled to? They have asserted such claims, and such claims have been resolved. There's no litigation or administrative claim pending at this point in time based upon my latest research. Scott's also advanced an argument that there's some question as to the validity of the contractual provisions, which limited the liability. The Court of Federal Claims in Reservation Ranch specifically upheld the validity of the C9.52 provision and rejected such an argument. So there is authority that no such remedy is available. And let me turn back to what I think is the real gravity of the case. And the gravity of the case is, where do you start your analysis? And I think the proper place to start the analysis in this case is, what is a plaintiff's duty to prove its entitlement to damages? That's the question the Court addressed in College Point Voting. That's the question the Supreme Court addressed in Penn Foundry. In both College Point Voting and Penn Foundry, the Supreme Court found that the plaintiff failed to meet its duty. In College Point Voting, it was because the President had the ultimate authority to terminate the contracts. The trial court below rejected application upon the basis of its reading and the reading of a Board of Contract Appeals decision that, in College Point Voting, the Supreme Court held that this authority, or this principle, only applied in cases where the government had what the Court characterized as an unconditional right to termination. That is not the holding of College Point Voting. The Supreme Court, in College Point Voting, mentioned the fact that there was unconditional authority to suspend. But the Supreme Court specifically set forth a rule of law as to which cases a plaintiff would have no right to recover breach expectancy damages. That statement of law does not include any requirement that the right to terminate be unconditional. And indeed, any such holding is inconsistent with the long line of cases in which the Court of Claims applied College Point Voting. Even where the contracting officer has to make a determination, according to the Court of Claims held, that the principles of College Point Voting may serve to bar a claim for breach expectancy damages. Pen Foundry, I think, is important as well to the extent that it addresses a contractor's burden to prove entitlement to damages. In Pen Foundry, the situation existed that the contractor couldn't meet the contractually required schedule for delivery. And that appears to be undisputed. He would have to go to the government and seek authority. The Supreme Court, in Pen Foundry, held that there was no entitlement to breach expectancy damages because there was no guarantee that the government would grant such authority. And under these circumstances, a contractor could not meet its burden of proving entitlement to breach expectancy damages. The Court of Federal Claims, the seminal case of the Court of Federal Claims, involving a contractor's burden to prove entitlement to breach expectancy damages, is Merlin v. United States. I recognize that there has been some tension in reading that decision in recent decisions in this case. Scott relies extensively on a panel decision of this court in Citizen Federal. Now, Citizen Federal has no proper application here for several reasons. One, in Citizens Federal, a panel of this court held that the trial court did not abuse its discretion in applying a substantial factor test in defending entitlement to breach expectancy damages. In the examination of the decision here below, and I'm referring to the appendix to Scott's brief, page footnote 2 of the court's opinion, in that footnote 2 of the court's opinion, the court specifically considered Scott's entitlement under a substantial factor test and held that it made no difference as to what standard was applied. That whether you applied a substantial factor or a but-for analysis, Scott still was not entitled to breach expectancy damages. Citizen Federal has no proper application in this case because the trial court specifically considered it. Citizen Federal, moreover, held that the trial court did not abuse its discretion in applying a substantial factor test. Here, and in no way suggests that the application of a but-for analysis in a case such as this would be improper. Citizens Federal provides no support whatsoever for an argument that the trial court provided the incorrect standard here. Let me turn to the question of the proper application of the impact of the Endangered Species Act in this case. As an applicant, Scott couldn't make a binding commitment of resources, and what that does is prevents people that are involved in the administrative process from changing the equation that might be made in driving various environmental situations. Cutting down the trees is the ultimate commitment of resources in this case. Scott's contention that it could have gone ahead and harvested and earned these breach expectancy damages applies in the face of Scott's commitment as an applicant under the Endangered Species Act, consistent with Scott's legal responsibilities that Scott had as an applicant under the Endangered Species Act. Scott cannot meet its burden to prove an entitlement to breach expectancy damages, especially under Penn Foundry and under College Point Boat. This court can, but need not, turn to its own precedent in this regard, because the precedent of the Supreme Court, I think, definitively establishes that under the facts of this case, Scott cannot recover its entitlement to breach expectancy damages. For the reasons set forth both in the trial court's opinion, our brief and that I've set forth today, this court should affirm the decision of the trial court, which dismissed Scott's claim for breach expectancy damages, but allowed Scott other relief in accordance with the terms of the contract. Thank you, Mr. Brooks. We have a little over two minutes remaining. In terms of getting replacement timber under the rescission act, where is the problem? The timber came about 12 years after the breach. There was a period of time when our client did not have timber to run through its mills. That's where the problem is, Your Honor. There were times when our client was running its mills at less than the capacity that it should have because of the suspension. And for that, you got cancellation costs, right? We got some out-of-pocket costs. We did not get all the out-of-pocket costs that you claim. I'm sorry? You got all the out-of-pocket costs. We got all the out-of-pocket costs that were available under the contract. We were not made whole, however, Your Honor. But there's no issue about out-of-pocket costs on this appeal. No, there is no. It's all profit, right? It's all return of cost. It's not profit at all. We got no profit. None, not a penny. What do you mean? I thought the claim here was the expectancy damage. Yes, we are. You're saying, well, we got paid. No, you got paid. There is no issue on this appeal. You are not claiming additional costs on this appeal. It's all profit that you're claiming. That's not necessarily true, Your Honor. We are asking for unabsorbed costs as well. If we get remanded back for damages, that's what we would put on the table. Our expectancy plus the costs that we did not get, such as unamortized mill costs, for running at lower than capacity. The regulations, contrary to what Mr. Brode told you, the regulations did allow for the agency to provide scot and timber from outside the sale area. The Secretary could approve that. Yes, they could have canceled. If certain findings were made, but they would have had to have paid us damages. As a matter of fact, at the very time of these cancellations, the Forest Service was paying replacement costs in one of the regions of the Forest Service so that we would have gotten, if they had followed what they were doing elsewhere, they would have paid us in excess of what they would have paid under that C9.51 clause. I think that what is important also to realize is that Judge Margolis found that while the listing of the species was foreseeable, that the listing was a sovereign act, it was also foreseeable, therefore, the suspension was not a sovereign act, and as this Court found, it was a breach. Mr. Saltzman? Yes. Thank you, Your Honor. Thank you. Our next case will be Janetty v. Hartman. That brings us to the next case.